[No. B114718. Second Dist. Div. Three. Mar. 31, 1998.]

WASHINGTON INTERNATIONAL INSURANCE COMPANY,
Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
G. K. BACKLUND, INC., Real Party in Interest.

**COUNSEL**

Booth, Mitchel & Strange, Robert C. Niesley and Christopher C. Lewi for Petitioner.

No appearance for Respondent.

Pickett & Schroeder and Aliece M. Pickett for Real Party in Interest.

**OPINION**

**CROSKEY, J.**—Washington International Insurance Company, Inc. (Washington) seeks review of an order denying its motion to strike portions of the first amended complaint of G. K. Backlund, Inc. (Backlund), a subcontractor. The purpose of its motion to strike was to delete Backlund's claim that Washington, as the surety on a public works payment bond, was liable for certain sums which Green Coast, the contractor, had failed to pay to Backlund. These sums represented a statutory "interest penalty," imposed pursuant to Public Contract Code section 10262.5, which Green Coast was

required to pay to Backlund because of Green Coast's failure to make timely payments on the subcontract.[1]

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Ezra Levi, a construction contractor, did business as Green Coast. Backlund is a licensed engineering, excavation and grading contractor. Levi entered into a contract with California Department of Transportation (Caltrans) for work on Highway 150 (the work of improvement). On August 30, 1995, Levi executed into a subcontract with Backlund, whereby Backlund was to perform clearing, grubbing, excavation and grading services on the work of improvement for the sum of $269,650. The subcontract, consistent with section 10262.5, provided that payment was due to Backlund from Levi "within 10 days from receipt by Caltrans." It also incorporated by reference the prime contract between Levi and Caltrans. The prime contract was governed by the standard specifications promulgated by Caltrans, section 4-1.03 of which allows Caltrans to make changes to the scope of the work.

After execution of the subcontract, Backlund and Levi entered into a series of written and oral modifications to the subcontract, and Caltrans, following a series of slides on the property where the work of improvement was being done, issued several change orders to Levi. Caltrans also increased certain contract unit prices. As a result, the final revised subcontract price rose to $953,641.04.

Thereafter, Caltrans gave a proposed final estimate (PFE) to Levi, and Levi submitted his exceptions to the PFE, which included claims for Backlund's extra work. However, Levi failed to disclose the PFE or his proposed exceptions to it to Backlund.

Although Levi received progress and retention payments twice monthly from Caltrans, Levi failed to pay Backlund its share of these payments (such

---

[1]Unless otherwise indicated, all further statutory references will be to the Public Contract Code. Section 10262.5, which is incorporated by law into all public works construction subcontracts, provides that the prime contractor's failure to pay a subcontractor within 10 days of receipt of each progress or retention payment subjects the prime contractor to a "penalty" of 2 percent interest per month on any amounts unpaid after the 10-day period. Section 10262.5 also allows subcontractors to recover the attorney fees and costs they incur collecting any wrongfully withheld payments.

[2]The facts which we recite are taken from the first amended complaint (the complaint). Because this petition for review arises from the denial of a motion to strike portions of the complaint, the court treats as true the material facts alleged in the complaint, as well as any facts which may be implied or inferred from those expressly alleged, and then considers de novo the effect of such facts on the motion to strike, which motion raised only a question of law. (See, e.g., *Winton* v. *Municipal Court* (1975) 48 Cal.App.3d 228, 237 [121 Cal.Rptr. 561].)

share being $298,390.98) within 10 days of Levi's receipt of the payments from Caltrans. Backlund filed a stop notice, and Levi misrepresented to Backlund that Caltrans had not paid him for Backlund's work, and was contesting the claim for such work. He proposed that if Backlund would accept a reduced amount for its work, he would pay Backlund that amount, regardless of whether Caltrans paid Levi for the work or not, provided Backlund released the stop notice. Backlund agreed to this, but Levi did not pay the agreed sum, and Backlund subsequently discovered the deception. After Levi filed for bankruptcy, Backlund filed suit against several defendants, including Washington, the surety which had issued to Green Coast the public works payment bond on the project. Backlund's suit sought, among other things, (1) to rescind its agreement with Levi to accept less money on the grounds of fraud and failure of consideration, and (2) to recover on the payment bond for the total amount owed, including the 2 percent interest penalty for failure to make timely payment.

Washington moved to strike portions of the first amended complaint which requested payment of the 2 percent interest penalty for failure to make timely payments on the ground that such statutory penalties were not recoverable from the surety as a matter of law. The trial court denied its motion, and this petition for a writ of mandate requiring the trial court to grant the motion followed. In order to consider the novel issues raised by Washington, we issued an alternative writ and set the matter for hearing.

### Contentions on Appeal

Washington contends that, as the surety, it is not liable to pay the interest penalty allegedly owed by Green Coast to Backlund for two independent reasons. First, Washington contends that because a public works payment bond exists to reimburse claimants under the bond only for labor or materials used or consumed on the work of improvement, and because the two percent per month interest penalty imposed by section 10262.5 is a statutory penalty, not a form of reimbursement for out-of-pocket expenses or actual outlay, ipso facto the bond does not cover the interest penalty.

Second, Washington contends that requiring it to pay the 2 percent per month interest penalty violates public policy by providing insurance coverage for the contractor's allegedly willful misconduct, in violation of Insurance Code section 533.

Backlund, on the other hand, contends that Washington, as the surety, *is* liable for the 2 percent interest penalty, and that such result is in keeping with suretyship law and analogous case law. For the reasons stated below,

we agree with Backlund, and, accordingly, we deny Washington's petition for a writ of mandate because the trial court did not err by refusing to strike Backlund's claim for the interest penalty from its first amended complaint.

## DISCUSSION

1. *A Public Works Payment Bond, Unlike a Mechanic's Lien, Exists to Secure Payment to the Claimant of the Amount Due From the Principal, and the Interest Penalty Is Clearly a Part of That Claim*

As a prerequisite to contracting on a public works project, a contractor must obtain both payment and performance bonds from a surety approved by the state. (§§ 7103, 10221; Civ. Code § 3247.) ■ Performance bonds given in connection with public works of improvement are intended to provide a substitute for the mechanics' lien rights (see Civ. Code, § 3110 et seq.) available to those persons who provide labor for or furnish materials or equipment to a private work of improvement because the mechanic's lien provisions of Civil Code section 3110 are inapplicable to any public work of improvement. (Civ. Code, § 3109; *John A. Artukovich Sons, Inc.* v. *American Fidelity Fire Ins. Co.* (1977) 72 Cal.App.3d 940, 946 [140 Cal.Rptr. 434].)

Thus, in lieu of mechanic's lien rights, persons who supply labor and materials on a public work of improvement are given rights against the surety on the payment bond which, by statute, the prime contractor is required to provide pursuant to either section 7103 or Civil Code section 3247. (*John A. Artukovich Sons, Inc.* v. *American Fidelity Fire Ins. Co., supra,* 72 Cal.App.3d at p. 946.)

■ Under a mechanic's lien, a claimant is only entitled to recover "the reasonable value of the labor, services, equipment, or materials furnished" *or* "the price agreed upon by the claimant and the person with whom he or she contracted, whichever is *less*." (Civ. Code, § 3123, italics added.) In contrast, a payment bond, given in connection with a public work of improvement according to the terms of the statute under which it is required, is not limited to reimbursing unpaid subcontractors and others for only the reasonable value of the labor or materials furnished. Instead, a payment bond "shall secure the payment of the *claims* of laborers, mechanics or materialmen employed on the work under the contract and shall contain all other provisions required by law." (§ 10223, italics added.)[3] Under section 10262.5, subdivision (a), if the contractor fails to make progress payments to a

---

[3] See also Civil Code section 3096 defining "payment bond" as "a bond with good and sufficient sureties that is conditioned for the payment in full of the claims of all claimants . . . ."

subcontractor within 10 days of receiving payment from the contracting public agency, then the contractor must pay to the subcontractor "a penalty of 2 percent of the amount due per month for each month that payment is not made," as well as attorney fees and costs if the subcontractor brings an action to collect such sums and prevails. Thus, a subcontractor who is not paid progress payments in a timely manner clearly has a claim against the contractor for unpaid payments *and* for the 2 percent per month interest penalty.

Here, the payment bond issued by Washington on behalf of Backlund provided in relevant part: "[t]he condition of this obligation is such, that if said Principal . . . shall fail to pay any of the persons named in Civil Code section 3181 [i.e., subcontractors such as Backlund] *with respect to work or labor performed by such claimant,* . . . the surety herein will pay for the same in an amount not exceeding the sum specified in the bond [$691,179.25] . . . ." (Italics added.) Washington contends that, under this bond, it is only required to pay Backlund for labor or materials used or consumed on the work of improvement, not for the 2 percent per month interest penalty, which interest penalty does not represent out-of-pocket expenses or actual outlay.

It is true that a surety on an official bond undertakes no liability for anything which is not within the letter of the surety contract, and that the surety's obligation is *strictissimi juris*; that is, the surety has consented to be bound only within the express terms of the surety contract. (*Schmitt* v. *Insurance Co. of North America* (1991) 230 Cal.App.3d 245, 258 [281 Cal.Rptr. 261].) However, it is equally true that where a surety bond is given pursuant to the requirements of a particular statute, the statutory provisions are incorporated into the bond, (*ibid.*) and that this is true whether or not the bond makes specific reference to the statute pursuant to whose requirements it is given, so long as it appears from all the circumstances that it was given pursuant to such statute. (*Evans* v. *Shackelford* (1923) 64 Cal.App. 750, 754 [222 P. 846]; Cal. Surety & Fidelity Bond Practice (Cont.Ed.Bar 1969) Statutory and Common Law Bonds, § 5.2, pp. 39-40.) Here, there is no dispute that the bond in question was a statutory bond designed to assure payment, pursuant to section 10262.5, of any of "the claims" of laborers, mechanics or materialmen employed on the work under the public works contract, not merely the reasonable value of the labor, services, equipment, or materials furnished, if such value is less than the contract price.

While no case law exists as to the meaning of "the claims" of laborers, mechanics or materialmen employed on the work under the public works contract as that term is used in section 10262.5, case law construing an

analogous statutory scheme related to payment bonds on private works of improvement reaches the conclusion that the term "the claims" includes *all* amounts owed to an unpaid subcontractor on a private work of improvement, not just the reasonable value of labor or materials supplied to the work of improvement. Thus, in *John A. Artukovich Sons, Inc.* v. *American Fidelity Fire Ins. Co., supra,* 72 Cal.App.3d 940, the court noted:

"The extent of the obligation of payment bonds is stated in Civil Code section 3226 as follows: 'Any bond given pursuant to the provisions of this title [title 15, "Works of Improvement"] *will be construed most strongly against the surety and in favor of all persons for whose benefit such bond is given,* and under no circumstances shall a surety be released from liability to those for whose benefit such bond has been given, by reason of any breach of contract between the owner and original contractor or on the part of any obligee named in such bond, but the sole conditions of recovery shall be that claimant is a person described in Section 3110, 3111, or 3112, *and has not been paid the full amount of his claim.*'

"The legislative policy of liberality in favor of payment bond beneficiaries is further evidenced by the fact that though *mechanics' lien claims are limited* in amount to '*the reasonable value of the labor, services, equipment, or materials furnished or for the price agreed upon* by the claimant and the person with whom he contracted, whichever is *less*' (Civ. Code, § 3123), *no similar limitation has been placed upon the amount of the beneficiaries' claim against the surety.* California Mechanics' Liens and Other Remedies (Cont.Ed.Bar 1972) section 4.45, pages 120-121, states: 'Although a mechanics' lien may not exceed the reasonable value or the contract price, whichever is less, *H. G. Fenton Material Co.* v. *Noble* (1932) 127 [Cal.App.] 338, 15 [P.2d] 884, held that the contract price prevailed in a bond action. Since new C[ivil] C[ode] [section] 3123 is similar to the statutes involved in the *Fenton* case, it is likely that the holding in *Fenton* would be the same today.' " (*John A. Artukovich Sons, Inc.* v. *American Fidelity Fire Ins. Co., supra,* 72 Cal.App.3d at pp. 946-947, italics added; see also *Granite Construction Co.* v. *American Motorists Ins. Co.* (1994) 29 Cal.App.4th 658 [34 Cal.Rptr.2d 835] [rejecting the argument that a surety's liability under a public works payment bond was limited to the amounts recoverable by a mechanic's lien claimant (at p. 670), and holding that the claimant on the bond was entitled to recover the 1.2 percent per month interest charges which the contractor had agreed by contract to pay to the subcontractor as the price of the retention of sums due longer than an agreed-upon number of days (at p. 671)].)

As noted above, where a surety bond is given pursuant to the requirements of a particular statute, the statutory provisions are incorporated into the

bond, whether or not the bond makes specific reference to the statute. So, too, all applicable laws in existence when a contract is made become a part of the contract as fully as if incorporated by reference. (See, e.g., *Silveira* v. *Ohm* (1949) 33 Cal.2d 272, 277-278 [201 P.2d 387] [crop lease held to be governed by Civil Code section 1935, requiring apportionment of rent when lease terminates before end of specified period, even though the code section was not expressly included in the terms of the lease].) Therefore, Washington's obligation to pay the two percent per month interest penalty if the contractor defaults arises not only from the bond, which incorporates the statutory requirements related to progress payments on works of public improvement, but also from Green Coast's contract with Backlund, in which is incorporated, as a matter of law, the statutory requirement of a 2 percent per month interest penalty on unpaid amounts as well.

> 2. *Requiring a Surety on a Public Works Payment Bond to Pay the 2 Percent per Month Interest Penalty Does Not Violate Public Policy*

■ Washington contends that it would violate public policy to require it to pay the 2 percent per month interest penalty, citing Insurance Code section 533. Insurance Code section 533 provides, in relevant part: "An insurer is not liable for a loss caused by the wilful act of the insured; . . ." and embodies the public policy against indemnity coverage for intentional torts. (*J. C. Penney Casualty Ins. Co.* v. *M. K.* (1991) 52 Cal.3d 1009, 1019-1021 [278 Cal.Rptr. 64, 804 P.2d 689].) However, Washington has ignored the distinction between a contract of insurance which indemnifies an insured against liability in tort and a contract of suretyship which guarantees performance on a contract by a principal.

A surety bond and a liability insurance policy are conceptually and legally distinct. (*Airlines Reporting Corp.* v. *United States Fidelity & Guaranty Co.* (1995) 31 Cal.App.4th 1458, 1464 [37 Cal.Rptr.2d 563].) An insurer undertakes to indemnify another " 'against loss, damage, or liability arising from an unknown or contingent event,' whereas a surety promises to 'answer for the debt, default, or miscarriage of another.' [Citation.]" (*Ibid.*) The surety relationship is a tripartite one, in which the third party (the obligee, or, here, the subcontractor), rather than the principal (here, the contractor), is protected by the surety's promise to pay if the principal does not, in exchange for which promise the principal pays the premium for the bond. (*Ibid.*) While an insurer has no right of subrogation against its insured, a surety has every right to reimbursement from its principal. (*Ibid.*) In other words, under a surety bond, the principal is *not* indemnified; the surety can sue the principal for any sums it must pay out to the obligee, and the public policy embodied in Insurance Code section 533 is in no way offended.

Another difference between insurance policies and surety bonds is that the premiums on insurance policies are calculated based on predictions of the risk of claims against a pool of insureds; the premiums on surety bonds are calculated based on individual contract factors such as the financial stability of the principal, the size of the obligation being guaranteed, and the likelihood of default. (31 Cal.App.4th at p. 1464.) Thus, in calculating the premium for a payment bond on a public works project, a surety can take into account, as one of these factors, that it may be called upon to honor the contractor's obligation to pay not only the subcontract price, but an additional 2 percent per month interest penalty as damages for failure to make timely payment. The surety, as one in the business of calculating such risks and determining an appropriate price for undertaking them, is in a better position to extract payment for taking on this risk before issuing the payment bond than is the subcontractor to protect itself from the contractor's failure to make timely payments. Therefore, our holding interpreting section 10262.5 as requiring the surety to pay the 2 percent per month interest penalty if the contractor does not do so (as opposed to an interpretation which would leave the subcontractor to bear alone the economic consequences of delayed payments), is in keeping with the general principle that risks should be borne by those best able to spread them out over the economy. (See, e.g., *Becker* v. *IRM Corp.* (1985) 38 Cal.3d 454, 477 [213 Cal.Rptr. 213, 698 P.2d 116, 48 A.L.R.4th 601], overruled on other grounds, *Peterson* v. *Superior Court* (1995) 10 Cal.4th 1185, 1210 [43 Cal.Rptr.2d 836, 899 P.2d 905]; *Hinman* v. *Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 959-960 [88 Cal.Rptr. 188, 471 P.2d 988]; *Martinez* v. *Hagopian* (1986) 182 Cal.App.3d 1223, 1227-1228 [227 Cal.Rptr. 763]; *Rawlings* v. *D. M. Oliver, Inc.* (1979) 97 Cal.App.3d 890, 901 [159 Cal.Rptr. 119].)[4]

Because Insurance Code section 533 is simply inapplicable to surety bonds, it is irrelevant whether the 2 percent per month interest penalty is really "interest" or really a "penalty." Whatever it is, it is an amount the principal is obligated to pay, and the surety is obligated to pay amounts the principal should have paid, but did not: " '[T]he undertaking of a . . . surety is to protect the promisee [here, the subcontractor] against loss or damage through the failure of a third person [here, the contractor] *to carry out his obligations to the promisee.*' [Citation.]" (*Somers* v. *United States F. & G.*

---

[4]Washington argues that this result will increase the cost of performance bonds, and hence increase the cost of constructing public works. However, we are aware of no reason, nor does Washington supply one, why contractors should be entitled to the benefit of less costly payment bonds at the expense of decreased protection against such contractors' own breach of their duties to timely pay subcontractors.

*Co.* (1923) 191 Cal. 542, 547 [217 P. 746]; *Airlines Reporting Corp.* v. *United States Fidelity & Guaranty Co., supra,* 31 Cal.App.4th at p. 1465, fn. 2.)[5]

## DISPOSITION

The alternative writ is discharged. The petition for writ of mandate is denied. The matter is remanded to the trial court for further proceedings consistent with this opinion. Each party to bear its own costs.

Klein, P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied April 23, 1998, and petitioner's application for review by the Supreme Court was denied July 8, 1998.

---

[5]Although we need not reach this issue, we note that the "interest penalty" appears to be more in the nature of reimbursement to the subcontractor for the value of the loss of the use of progress payments than in the nature of a fine or penalty against the contractor, and to be designed to coerce prompt payment rather than to punish delay. Rather than fixing a flat fine or fee for delayed payment, the Legislature defined the penalty for late payment in terms of interest directly tied to the total amount of wrongfully withheld moneys and the total amount of time such moneys are withheld. Thus, the amount of "penalty" to be paid by the wrongdoer is entirely within his or her control, a hallmark of coercion rather than punishment, as well as of an intent to make the victim of such wrongdoing whole, rather than to punish the wrongdoer. Thus, in an analogous situation, " '[i]n cases where [a trustee] has mingled moneys belonging to his trust with his own funds, and used them for his own advantage, courts have charged him with compound interest, upon the theory that[,] in the absence of evidence to the contrary, he will be presumed to have received such profits from their use. [Citation.] This rule . . . . has been adopted, *"not for punishing* the delinquent trustee, *but for the purpose of attaining the actual or presumed gains, and to make certain that nothing of profit or advantage remains to the trustee,* except, perhaps, his commission or compensation." [Citations.]' " (*Douglas* v. *Westfall* (1952) 113 Cal.App.2d 107, 112-113 [248 P.2d 68], italics added; see also Prob. Code, § 16441.) In other words, "extra" or "penalty" interest may be a form of precalculated economic damages for depriving another of the use of money which the other would have had a right to use. (See, e.g., *Walton* v. *Eu* (1983) 143 Cal.App.3d 403, 405 [191 Cal.Rptr. 779] [referring to "interest penalty" for early withdrawal of investment certificates]; *Hrimnak* v. *Watkins* (1995) 38 Cal.App.4th 964, 979 [45 Cal.Rptr.2d 514] [referring to the prejudgment "interest penalty" owed under Code of Civil Procedure section 998 and Civil Code section 3291 if a judgment is larger than the amount of a rejected settlement offer].) It is well established that sureties can be held liable to pay such sums. "As stated in *Lawrence Tractor Co.* v. *Carlisle Ins. Co.* (1988) 202 Cal.App.3d 949, 955 [249 Cal.Rptr. 150], *interest is an element of the damages caused by the principal's conduct,* for which the surety cannot be held in *excess* of the amount of its bond." (*Harris* v. *Northwestern Nat. Ins. Co.* (1992) 6 Cal.App.4th 1061, 1067 [8 Cal.Rptr.2d 234], some italics added.)